IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| NICKI M. TODARO, | : | Case No. 19-23010-CMB |
| *Debtor* | : | |
| | : | Chapter 13 |
| NICKI M. TODARO, | : | |
| *Plaintiff* | : | Adv. No. 20-2035-CMB |
| | : | |
| v. | : | Related to Doc. Nos.  90, 94 |
| | : | |
| WELLS FARGO BANK, N.A. | : | |
| *Defendant* | : | |

| | | |
|---|---|---|
| WELLS FARGO BANK, N.A. | : | |
| *Third-Party Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| PNC BANK, N.A. | : | |
| *Third-Party Defendant* | : | |

## <u>MEMORANDUM OPINION</u>

This adversary proceeding was initiated when the Debtor filed a Complaint to Determine Secured Status ("Complaint") pursuant to *11 U.S.C. §506(d)* against Wells Fargo Bank, N.A. ("Wells Fargo"), which holds a second position mortgage against her residence. Debtor seeks a finding from the Court that her residence is subject to a first place mortgage held by PNC Bank, N.A. ("PNC"), that the residence has a value that is less than the amount owed on the PNC mortgage, and that therefore the Wells Fargo mortgage is completely unsecured. Wells Fargo filed an Answer to the Complaint in which  it also raised a number of counterclaims against the Debtor,

the gist of which is that Wells Fargo loaned money to the Debtor on the promise and understanding

that it would be used in part to pay off the debt to PNC and satisfy the PNC mortgage, thereby

leaving Wells Fargo's mortgage in a first position, but that the Debtor breached that promise and

understanding, to the detriment of Wells Fargo.

In addition to these counterclaims against the Debtor, Wells Fargo also filed a Third-

Party Complaint against PNC, asserting a number of different claims that all seek to result in a

finding that the mortgage held by Wells Fargo has priority over the one held by PNC even though

it was filed later in time.   PNC filed an Answer to the Third-Party Complaint denying any

wrongdoing that would justify the relief being sought by Wells Fargo.

The Parties have completed discovery and motions for summary judgment have been

filed by Wells Fargo as against both Debtor and PNC, *see* Doc. No. 94, and by PNC as against Wells

Fargo, *see* Doc. No. 90. The Court has jurisdiction over this matter pursuant to *28 U.S.C. §§ 1334*

*and 157*. This is a core proceeding pursuant to *28 U.S.C. § 157(b)(2)(A)* and *(K)*.   Oral argument on

the motions for summary judgment was held on December 6, 2022.   For the reasons set forth below,

the Court will grant the PNC motion for summary judgment, deny the Wells Fargo motion for

summary judgment as against PNC, and enter judgment in favor of PNC and against Wells Fargo

on the Third-Party Complaint.   The Court will also grant the Wells Fargo motion for summary

judgment as against the Debtor, in part, while denying without prejudice Wells Fargo's attempt to

have the Debtor's bankruptcy dismissed on the grounds of bad faith.

## FACTS

All three of the  Parties filed a Stipulation of Facts and Documents ("Stipulation") in the case at Doc. No. 68, several months prior to either of the summary judgment motions.  The Stipulation sets forth a series of undisputed  facts and attaches relevant documents that the Parties agree are authentic.  Based just on this Stipulation many of the material facts for the case can be gleaned.  Wells Fargo and PNC have also each separately filed a "Concise Statement of Material Facts" in connection with their respective motions for summary judgment, and have each responded to the opposing party's Concise Statement.  *See*, Doc. Nos.  88, 91, 98, 101.  These have added some additional undisputed material facts to those set forth in the Stipulation, though the Parties also assert some disagreements as to the scope or meaning of the presented facts.  The Court below sets forth the undisputed relevant and material facts.

The Debtor is the owner of and resides on  real property located at 736 2nd Street, Newell, Pennsylvania that is designated as Fayette County Tax Parcel ID Number 23-02-0007 (the "Property").  On or about April 23, 2007, PNC's predecessor in interest, National City Bank ("NCB"),[1] provided a home  equity line of credit to the Debtor up to the maximum principal amount of $50,000.00 (the " Line of Credit").  In connection therewith Debtor executed an "Equity Reserve" agreement with NCB dated April 23, 2007, that memorializes the Line of Credit (the "PNC

---

[1]

At an unspecified time after April 23, 2007, NCB merged with and into PNC, with PNC thereby assuming all of the rights, duties, obligations, and benefits of NCB relative to NCB's dealings with the Debtor.  For purposes of this Memorandum Opinion, PNC and NCB can be considered as being interchangeable and  the same party unless otherwise expressly noted, though the Court will generally refer to relevant documents and relationships between it and the Debtor using "PNC" as the designator to avoid confusion and reflect the current status.

3

Agreement"). *See*, Stipulation, Exhibit A.  The PNC Agreement provides that: "Your Line is an

open-end line of credit which you may use to obtain cash advances (Advances) from time to time

for a period of 10 years." It also provides that it is governed by federal laws and regulations, and the

laws of Ohio except to the extent they are preempted by federal law.

The Debtor's obligations under the PNC Agreement were secured by a mortgage on

the Property executed by her on April 23, 2007, in favor of NCB, and recorded on May 11, 2007,

in the Office of the Recorder of Deeds of Fayette County, Pennsylvania at Instrument No.

200700006581 ("the PNC Mortgage").  *See*, Stipulation, Exhibit B.  The PNC Mortgage states in

large type near its beginning that it is an "Open-End Mortgage."  It also provides, in an introductory

paragraph preceding the covenants and agreements, that:

> ... should Borrower [i.e., Debtor] pay in full all sums secured by this Mortgage,
> and perform all covenants and agreements secured by this Mortgage, the estate
> hereby granted shall be discharged, provided Lender has no further obligation to
> make Advances under the [PNC] Agreement.

As of July 23, 2009, a little more than two years later, the Debtor's balance on the  Line of Credit

was $50,019.66.

In response to a "request" made by or on behalf of the Debtor, the details of which

have not been presented by the Parties, NCB  issued a  letter to the Debtor on August 3, 2009

("Payoff Letter").  *See*, Stipulation, Exhibit G.  The Payoff Letter shows a "Payoff amount" of

$50,102.58 for the Line of Credit and also  includes a line item for "Prepayment penalty" in the

amount of $350.00.[2] The Parties have not located any other revised, amended, or corrected payoff letter that was issued at that time.

On or about August 11, 2009, the Debtor executed and submitted a loan application to apply for a loan from Wells Fargo in the amount of $69,190.00 ("WF Loan Application"). *See*, Stipulation, Exhibit C.   The WF  Loan Application indicates that the purpose of the proposed loan was a "refinance" of the Debtor's primary residence. Following the submission of the Debtor's WF Loan Application, Wells Fargo issued a Commitment Letter to the Debtor, which was received by the Debtor.[3]  *See*, Stipulation, Exhibit D.  The Commitment Letter includes among  its conditions for loan approval that:

> Unless otherwise provided in the specific conditions section of this commitment,
> any and all existing liens on the property must be paid in full at closing.
> ...
>
> HUD-1 Settlement statement to reflect payoff of the following accounts: ... NCB
> NE ER #448961811025 $49,980.00

The Commitment Letter also provides under the "Title Matters" condition that a title insurance binder acceptable to Wells Fargo was to be provided prior to the closing and that it must "insure the validity and priority of the Lender's first lien on the property."

---

[2]

A provision in the PNC Agreement listing "Other Charges" that may be imposed on the Debtor in addition to interest states"[a]n early termination fee of 1% of your Credit Line limit, or $350.00, whichever is less, if you close your Line within the first 36 months."

[3]

The Commitment Letter is dated July 30, 2009, twelve days earlier than the WF Loan Application.  It also indicates a commitment expiration date of August 7, 2009 – four days earlier than the WF Loan Application.  The Parties have not explained these apparent discrepancies, but since they have stipulated that the Commitment Letter was issued following the submission of the WF Loan Application the Court will accept that as fact.

The Parties agree that the Debtor's agreement and understanding with respect to the Commitment Letter was that Wells Fargo would pay off the Line of Credit from the loan proceeds to be provided by Wells Fargo on behalf of the Debtor in exchange for the Debtor granting Wells Fargo a mortgage on her residence and executing a note reflecting the loan payment terms. *See*, Stipulation at ¶15. To that end, in connection with the loan transaction as reflected in the Commitment Letter (the "WF Loan"), the Debtor executed a mortgage in the amount of $69,190.00 in favor of Wells Fargo, encumbering the Property (the "WF Mortgage"). *See*, Stipulation, Exhibit E. The WF Mortgage was dated August 11, 2009, and recorded on August 19, 2009 in the Office of the Recorder of Deeds of Fayette County, Pennsylvania at Instrument No. 200900009878. The Debtor also executed a note in the amount of $69,190.00 in favor of Wells Fargo on or about August 11, 2009 (the "WF Note").[4]  *See*, Stipulation, Exhibit F.

The closing on the WF Loan also occurred on August 11, 2022. A HUD-1A Settlement Statement was prepared in connection with the closing of the WF Loan (the "Settlement Statement"). *See*, Stipulation, Exhibit H. The Settlement Statement accurately identifies various disbursements made in connection with the closing of the WF Loan. As reflected on the Settlement Statement, Wells Fargo disbursed $50,481.66 to NCB as a "Mortgage Payoff" on August 18, 2009, via a branch payment ("Branch Payment"). No further details as to this Branch Payment were provided, however, the Parties agree that in disbursing these funds, it was Wells Fargo's intention to pay the payoff amount and prepayment penalty set forth in the Payoff Letter that had been issued

---

[4]

Again, it seems unusual on its face that the WF Note and WF Mortgage are dated the same date as the WF Loan Application, and after the commitment expiration date as stated in the Commitment Letter, but the Parties have not provided any explanation for the point.

by NCB on August 3, 2009.  The Settlement Statement further indicates that the closing occurred

at the Property and that an entity named Economy Settlement Services acted as a settlement agent.

When NCB received the Branch Payment, it applied the funds to the balance then due

on the Debtor's Line of Credit account, after which  the Debtor's balance on the Line of Credit was

– $354.73 (indicating her account had a credit of that amount) as reflected on a statement prepared

by NCB in late August 2009 and sent to the Debtor showing the activity on the account.  *See*,

Stipulation, Exhibit I.  The Parties have not located any written request or written instruction that

was sent by Debtor or anyone on behalf of Debtor to NCB or PNC which directed that the  Line of

Credit was to be terminated or otherwise frozen, closed, or canceled in connection with the Branch

Payment.  *See*, Stipulation at ¶18.

As indicated above, NCB did not terminate the Line of Credit upon receipt of the

Branch Payment.  Accordingly, the Line of Credit remained open, the ten year draw period not yet

having run.  The PNC Mortgage was never satisfied and it remains of record to this date.  Following

the Branch Payment, the Debtor obtained further advances from PNC under the Line of Credit

beginning on September 9, 2009 (such advances referred to collectively hereinafter as the "Post-

Payoff Advances").  The Debtor has not repaid either the Line of Credit or the WF Loan, and  she

is therefore currently in default under the terms of both the PNC Mortgage and the WF Mortgage.

The  Debtor's bankruptcy was filed on July 30, 2019.   On  the  same  date  the

bankruptcy was filed, the Debtor filed a proposed Chapter 13 plan that indicated the Debtor would

seek to have Wells Fargo's claim treated as unsecured.  Wells Fargo filed Claim No. 1-1 in the case

on August 7, 2019, asserting a secured claim in the amount of $55,746.61 based on the WF

Mortgage.  PNC filed Claim No. 12-1 in the case on October 8, 2019, asserting a secured claim in

the amount of $54,937.73 based on the PNC Mortgage.[5]

An interim plan confirmation order was entered in the case on September 12, 2019

at Doc. No. 19.  Among the provisions in that order was one stating that all actions to determine

the priority, avoidability or extent of a lien under Sections 506, 507 or 522 of the Bankruptcy Code

were to be filed within 90 days of the claims bar date. The general claims bar date was set at October

8, 2019, and Wells Fargo and PNC agree that the 90th day thereafter was January 8, 2020.[6]  The

Debtor filed her complaint initiating this adversary proceeding on February 26, 2020.

## LEGAL DISCUSSION

### *(A)  Summary Judgment Standard*

*Fed.R.Bankr.P. 7056* incorporates *Fed.R.Civ.P. 56* and makes it applicable to

bankruptcy proceedings. Pursuant to *Rule 56*, the Court shall grant summary judgment to the moving

party "if the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*.  In applying this standard, the Court

must examine the record and reasonable inferences from it in the light most favorable to the party

---

[5]

Claim No. 12-1 has since been amended three different times, but the amount of the claim has remained the same. *See*, Claim No. 12-2 filed on November 26, 2019, Claim No. 12-3 filed on January 29, 2020, and Claim No. 12-4 filed on July 11, 2022.

[6]

It appears to the Court that this is an error and that the 90th day would actually have been Monday, January 6, 2020.  At any rate, this 2 day discrepancy is irrelevant as it makes no difference to the Court's decision.

opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

An issue of material fact is genuine if a reasonable fact-finder could return a verdict for the nonmoving party on the question. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). The moving party has the initial burden of proving to the Court the lack of evidence supporting the non-moving party's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). The burden then shifts to the non-moving party to come forward with specific facts showing a genuine issue for trial. The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information in filed documents such as depositions, answers to interrogatories and admissions, to meet its burden of proving elements essential to its claim. *Celotex*, 477 U.S. at 322. Evidence that raises only "some metaphysical doubt as to the material facts" does not create a genuine issue of fact. *Matsushita Elec.*, 475 U.S. at 586.

In the present case, the Court is faced with cross-motions for summary judgment as between Wells Fargo and PNC. Courts may resolve cross-motions for summary judgment concurrently. *See*, *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). When doing so, the Court is bound to view the evidence in the light most favorable to the nonmoving party with respect to each motion. *Id.* When both parties move for summary judgment, the Court must rule on each party's motion on an individual and separate basis, determining for each side whether a judgment may be entered in accordance with the *Rule 56* standard. *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016). If upon review of a party's motion for summary judgment, the Court, viewing the evidence in the light most favorable to the nonmoving party, enters

9

summary judgment for the moving party, the Court may properly declare the opposing party's cross-motion for summary judgment as moot. *Smarra v. Boilermaker-Blacksmith Nat'l Pension Tr.*, 584 F. Supp. 3d 21, 29 (W.D. Pa. 2022), appeal dismissed, 2022 WL 4015648 (3d Cir. July 7, 2022) (citing *Beenick v. LeFebvre*, 684 F. App'x 200, 205–06 (3d Cir. 2017)).

### (B) *Debtor v. Wells Fargo* – claim and counterclaims

Wells Fargo has moved for summary judgment with respect to the dispute between it and the Debtor. In its September 21, 2022 Order issued following the Wells Fargo Motion, *See* Doc. No. 95, the Court directed the Debtor to file a response to the Wells Fargo Concise Statement of Material Facts as well as a brief in opposition on or before October 31, 2022. The Debtor did neither, a failure to act which cannot be countenanced.

Wells Fargo raises two grounds in support of its motion for a grant of summary judgment against Debtor. First, it argues that the adversary proceeding must be dismissed as untimely. Wells Fargo points out that the September 12, 2019 Order that confirmed the Debtor's Chapter 13 plan on an interim basis provided that complaints pursuant to Section 506 seeking a determination as to the priority, avoidability, or extent of liens "shall be filed within ninety (90) days after the claims bar date." *See*, Main Case Doc. No. 19 at ¶2(D). It further argues that the claims bar date had been set at October 8, 2019 by the "Notice to File Proof of Claim" that was issued by the Clerk on July 31, 2019 and filed at Main Case Doc. No. 7. According to Wells Fargo, that means the deadline for filing the Debtor's adversary proceeding was January 8, 2020, and since this adversary was not filed by the Debtor until February 26, 2020, it was untimely and must be

dismissed for that reason.

The record before the Court clearly establishes that the adversary proceeding was filed late – more than a month beyond the deadline for doing so as set forth in the confirmation order.  The Court does not believe that a late filing is necessarily always fatal to an adversary proceeding such as the one filed by the Debtor, but at a minimum if challenged it does have the consequence of imposing upon the late filer the burden to show some reason why the lateness should be overlooked or excused.  In the present case, as was noted above, the Debtor has not responded to the Wells Fargo summary judgment motion despite being ordered to do so.  Thus, she has not provided any kind of reason to explain why the filing was so late, or why she could not have moved for an extension of the deadline.  Debtor's Counsel did appear at the oral argument on the summary judgment motion but he did not even attempt to excuse the late filing.

The Court is therefore left with a late-filed complaint and no basis to conclude that factual or equitable circumstances existed that should nevertheless allow it to move forward.  In fact, if anything, the record before the Court tends to show that the Debtor would not be able to make a convincing argument in that regard.  The Debtor indicated in her Chapter 13 Plan filed the same date as her bankruptcy petition  (July 30, 2019) that she would be seeking to avoid the Wells Fargo lien. *See*, Main Case Doc. No. 2 at Item 3.4.  She thus had ample time and opportunity to file an adversary proceeding but inexplicably waited to do so until it was too late.  Under these circumstances  the Court finds that the Wells Fargo motion for summary judgment seeking a dismissal of the adversary proceeding on timeliness grounds should be granted.

Wells  Fargo  next  argues  that  summary  judgment  should  be  granted  on  its

counterclaim seeking a dismissal of the bankruptcy because the Debtor "committed fraud and bad

faith with respect to her use of the line of credit after payoff of the same using the loan proceeds

received from Wells Fargo in exchange for her promise to terminate the line of credit and ensure the

satisfaction of the PNC Mortgage of record."  Wells Fargo Brief, Doc. No. 89 at 16.  It relies on

cases such as *In re Myers*, 491 F.3d 120 (3d Cir. 2007) that  stand for the proposition that a Chapter

13 bankruptcy filing  made in bad faith may be dismissed by the Court for "cause" under *11 U.S.C.

§1307(c)* even though that provision does not explicitly mention a requirement of good faith.[7] 491

F.3d at 125.  This argument, however, fails to take adequate account of the rule that whether a

Chapter 13 case has been filed in good faith is a fact-intensive inquiry that must be assessed on a

"case-by-case basis in light of the totality of the circumstances."  *In re Lilley*, 91 F.3d 491, 496 (3d

Cir. 1996).  According to the *Lilley* court the factors relevant to the totality of circumstances may

include, among others, the following:

> the nature of the debt...; the timing of the petition; how the debt arose;
> the debtor's motive in filing the petition; how the debtor's actions
> affected creditors; the debtor's treatment of creditors both before and
> after the petition was filed; and whether the debtor has been
> forthcoming with the bankruptcy court and the creditors.

91 F.3d at 496 (quoting *In re Love*, 957 F.2d 1350, 1357 (7th Cir. 1992).  Furthermore, dismissal on

bad faith grounds is to be reserved for truly  "egregious" cases.  *See*, e.g., *In re Hurlbutt*, No. 1:20-

---

[7]

    In its Brief in support of its motion for summary judgment Wells Fargo also cites the
requirement in *11 U.S.C. §1325(a)(3)* that a Chapter 13 plan must be proposed in good faith as a
basis for dismissing the case.  The same basic standards apply for determining good faith under that
provision as under *Section 1307(c)*.  *See*, e.g., *In re Dahlgren*, 418 B.R. 852, 857-58 (Bankr. D.N.J.
2009).  *See also*, *Section 1325(a)(7)* (debtor must have filed petition in good faith for plan to be
confirmed). The discussion herein should be read as applying to the good faith/bad faith inquiry
under any of these provisions.

bk-2553-HWV, 2021 WL 6101682, at *3 (Bankr. M.D. Pa. Dec. 23, 2021) (citing *In re Perlin*, 497

F.3d 364, 373 (3d Cir. 2007)).

        Were this standard to be applied here it is clear that summary judgment should not

be granted. Wells Fargo seems to assume that the undisputed facts that (1) the Line of Credit was

never closed or the PNC Mortgage satisfied, and (2) the Debtor continued to draw additional funds

from the Line of Credit following the August 18, 2009 payment to NCB, are in and of themselves

sufficient to show that the Debtor acted fraudulently or recklessly such that her case should be

dismissed as a bad faith filing. However, the totality of circumstances that must be considered

consists of much more than those bare facts, and the Stipulation and the Wells Fargo Concise

Statement of Material Facts say little or nothing about key issues the Court would need to address

before it could determine whether a dismissal of the bankruptcy case was appropriate.

        Without attempting to be exhaustive, the Court can set forth a number of questions

it thinks might be relevant in determining whether the case should be dismissed as a bad faith filing,

none of which are adequately addressed in the undisputed facts that have been presented by Wells

Fargo. Is there anything suspicious about the timing of the petition? (There does not seem to be,

at least from the perspective of the Wells Fargo debt, which was incurred by the Debtor

approximately 10 years prior to the bankruptcy filing, and which was apparently not the subject of

any foreclosure or other legal action by Wells Fargo prior to the filing according to the Statement

of Financial Affairs filed by the Debtor.) Did the Debtor have a legal or contractual obligation to

close the Line of Credit and ensure the PNC Mortgage was satisfied? Did she promise to do so?

When and how? If she made such a promise, did she intend to breach it as of the time she made it?

Did she knowingly breach such promise when she obtained the Post-Payoff Advances on the Line

of Credit?    Could the Debtor have reasonably assumed that Wells Fargo, acting in its own self-

interest,  would take the necessary steps to protect its lien and that  it was not her responsibility to

do so?

Further questions include what was the Debtor's motive in filing the bankruptcy

petition?  Did she make any payments to Wells Fargo in the roughly 10 years that elapsed between

the time she incurred the debt and when she filed her bankruptcy?  If so, how does that fit in with

the Wells Fargo theory that she was acting fraudulently?  Has the Debtor been forthcoming with the

Court and creditors in this bankruptcy?

Despite its skepticism as to the summary judgment motion regarding the

counterclaim, the Court will not rule on the motion for a more fundamental reason.  In the Court's

view, the question of whether a bankruptcy case should be dismissed as a bad faith filing is

something that is inherently of interest to the entire creditor pool, as well as to the trustee and the

United States Trustee.  By pursuing that issue as an adversary proceeding counterclaim involving

only the Debtor and a single creditor, many interested parties are excluded from the process, or

perhaps not even aware that it is occurring.[8]   The Court therefore believes it would be more

appropriate to proceed by way of a motion to dismiss filed in the main bankruptcy case.  The Wells

Fargo counterclaim based on alleged bad faith will be dismissed without prejudice to the same relief

being requested by a motion to dismiss, and the summary judgment motion will be denied as moot

---

[8]     It is also worth pointing out that dismissal of a bankruptcy case based on bad faith is not
among the universe of adversary proceedings as recognized by *Fed.R.Bankr.P. 7001.*

on this point.

Finally, although they are not a part of or even mentioned in the Wells Fargo motion for summary judgment, Wells Fargo has also asserted counterclaims against the Debtor based on unjust enrichment, equitable subrogation, and quiet title.  By not including them in its motion, it is possible that Wells Fargo has abandoned them, but if not the Court finds that they should be dismissed because (a) the dismissal of the Debtor's complaint against Wells Fargo on timeliness grounds as set forth above obviates and moots these counterclaims because the Debtor will not avoid the Wells Fargo lien as she had sought, and/or (b) the relief that Wells Fargo seeks  by way of these counterclaims is actually directed against PNC and its competing lien, a subject addressed below.

*(C)  Wells Fargo vs. PNC* – Third-Party Claim

The Court next addresses the third-party claims that Wells Fargo has filed against PNC.[9]  In its Third-Party Complaint Wells Fargo sets forth a number of different theories, all of which seek the same ultimate result: a finding that the PNC Mortgage should be set aside or extinguished, thereby leaving the WF Mortgage in the first position as a lien on Debtor's Property.  As summarized by Wells Fargo itself in its motion for summary judgment:

---

[9]

Given the dismissal of the complaint and the counterclaims,  the Court would have  the discretion to also dismiss the third-party complaint against PNC.  *See*, e.g., *American Zurich Insurance Co. v. Cooper Tire & Rubber Co.*, 512 F.3d 800, 805-06 (6th Cir. 2008).   The Court chooses not to exercise that discretion here and instead to rule on the cross-motions for summary judgment as to the third-party claim.  The Court notes that the parties to the third-party claim have devoted considerable time and effort to discovery and the presentation of their cases such that it would not be judicially expedient to require the matter  to be started again elsewhere.

15

> ...Wells Fargo raises various claims and affirmative defenses averring that the PNC Mortgage should be subrogated to its Mortgage because Wells Fargo's Mortgage was intended and promised by Debtor to hold first lien position against the Property and PNC's predecessor received a request to terminate its line of credit and satisfy the PNC Mortgage upon payoff of the same from the loan proceeds issued by Wells Fargo.

Doc. No. 94 at ¶5.

Wells Fargo's principal argument in support of this position focuses on the fact that the Payoff Letter issued by NCB included not only the "payoff" amount needed to bring the Line of Credit account balance to $0, but also a separate entry showing a $350 "prepayment penalty." Wells Fargo argues that the only place this could have come from was the "Other Charges" provision in the PNC Agreement that provided for an "early termination fee of 1% of the [Debtor's] Credit Line limit or $350.00, whichever is less, if [Debtor] closes [her] Line within the first 36 months." Wells Fargo asserts that the inclusion of the $350 figure in the Payoff Letter must mean that NCB had received a request from the Debtor that the Line of Credit be terminated within the first 36 months of the PNC Agreement. Thus, according to Wells Fargo, the Payoff Letter establishes that NCB had received such a request and makes clear that NCB was aware the Line of Credit should be terminated and the PNC Mortgage satisfied upon its receipt of the payment from the WF Loan closing.

While agreeing with Wells Fargo as to the likely origin of the $350 prepayment penalty figure contained in the Payoff Letter, the Court disagrees with the rest of Wells Fargo's conclusion. In that regard, it should first be reiterated that no direct evidence about the request to NCB that prompted the issuance of the Payoff Letter has been provided by the Parties. The relevant

16

Stipulation by the Parties merely provides that NCB issued the Payoff Letter "[i]n response to a request made by or on behalf of the Debtor." Stipulation at ¶9.  It has thus not been shown  who made the request to NCB, when it was made, whether it was made orally or in writing or both, and what exactly was said or written by the person who made the request.  The Payoff Letter itself provides some indirect evidence as to the nature of the request to which it was responding, but the Court does not believe it can be determined from the language of  the Payoff Letter whether the request asked for a payoff amount <u>and</u> explicitly directed that the Line of Credit was also to be terminated early, or whether it just asked for a payoff amount without saying  anything about an early termination. There is also no indication in the Payoff Letter that PNC was informed that the Debtor was seeking a refinancing loan through Wells Fargo

A consideration of the language  of the Payoff  Letter is instructive.  The first and most relevant portion of the Payoff Letter states as follows:

> To Whom It may Concern:
>
> Thank you for your recent inquiry concerning the above-referenced account.
>
> As you requested, I have listed the payoff information on your account.
>
> | Date payoff good through: | 50,102.58 |
> | Prepayment penalty: | $ 350.00 |
> | Payoff amount: | $50,102.58 |
> | Per diem: | $ 4.15 |
>
> To calculate the current payoff, add the per diem for each day after the good through date listed, including the day the payoff is made to the payoff amount listed above.

This language does not support the Wells Fargo contention that the $350 prepayment penalty was

"charged" by NCB in the Payoff Letter.[10]   The instruction  given in the Payoff Letter for how to

calculate the current payoff amount is to multiply the per diem ($4.15) by the appropriate number

of days and add that result to the listed payoff amount ($50,102.58).  The $350 prepayment penalty

is not even mentioned in these  calculation instructions.  Its inclusion in the Payoff Letter could

reasonably be viewed as NCB merely providing the additional,  incidental information that if Debtor

wanted to terminate the Line of Credit in connection with any "payoff" she might make that  the

prepayment penalty would  be required  because the PNC Agreement was still within its first 36

months.

In short, the Court does not view the Payoff Letter as proving that NCB had received

a request from or on behalf of the Debtor to terminate the Line of Credit and satisfy the PNC

Mortgage upon receipt of the payoff amount.  But even if it is assumed for the sake of argument that

the Payoff Letter does provide such proof,  it would at best be proof of an informal sort of request

and that would not carry the day for Wells Fargo because there is no evidence that such request  met

the legal requirements to effect a termination of an open-end mortgage such as the PNC Mortgage.

There is a dispute over whether Pennsylvania or Ohio law applies here, with PNC pointing to a

provision in the PNC Agreement stating that Ohio law controls except as preempted by federal law,

and  Wells  Fargo  arguing  for  Pennsylvania  law  to  apply  on  the  basis  that  the  Property  is  in

Pennsylvania and thus subject to its law.  The Court has reviewed the law of both states and

---

[10]

The Court also notes that it is unexplained why the Payoff Letter has the payoff figure of
50,102.58 (without a $ sign) in the space where a "good through" date would be expected.  This
anomaly is puzzling but plays no role in the Court's decision.

concludes that the end result is the same under both. The Court thus finds that there is no actual

conflict of law for present purposes and no need to engage in a choice of law analysis. *See*,

*Hammersmith v. TIG Insurance Co.*, 480 F.3d 220, 230 (3d Cir. 2007).

　　　　　Looking first at Pennsylvania law, the so-called open-ended mortgage statute, *42

Pa.C.S.A. §8143,* provides the general rule that a qualifying open-end mortgage may secure  unpaid

balances of advances made after the mortgage is left for record, and that the validity and

enforceability of the lien of the mortgage shall not be affected by the fact that the first advance is

made after the date the mortgage is recorded, or that there may be no outstanding debt for a period

of time after an advance or advances may have been made and repaid. *Section 8143(a)*. *See also,*

*42 Pa. C.S.A. §8141(2)* (mortgages other than purchase money mortgages have priority over each

other from the time they are left for record). An open-end mortgage securing unpaid balances of

advances is a lien on the premises described therein from the time it is left for record for the full

amount of the unpaid indebtedness regardless of the time when the advances are made. *Section

8143(b)*. An open-end mortgage only provides security to the extent that the total unpaid loan

indebtedness, exclusive of interest, does not exceed the maximum amount of loan indebtedness

which the mortgage states may be outstanding at any time. *Section 8143(f)* (definition of "open-end

mortgage").

　　　　　There is no dispute that the PNC Mortgage is a qualifying open-end mortgage under

this statute since it is expressly identified as such and it includes a $50,000 maximum amount of

debt.[11]   Under Pennsylvania law, the PNC Mortgage would thus have priority over the WF Mortgage,

even as to the Post-Payoff Advances that were made to the Debtor after the WF Mortgage was

recorded, unless the PNC Agreement and the Line of Credit account had been properly terminated

prior to those advances being made such that the PNC Mortgage should therefore have been

satisfied.   Provisions elsewhere in Pennsylvania law make clear that a written instruction by or on

behalf of the Debtor to terminate the PNC Agreement and satisfy the PNC Mortgage would have

been necessary to divest the PNC Mortgage from its priority position over the WF Mortgage.

Attention may first be drawn to *7 Pa. C.S.A. §6126*, entitled "Requirements as to

open-end loans," and in particular to Subsection (7) thereof, which provides in relevant part:

> (7) Notwithstanding any other provisions in this chapter to the
> contrary, ***a mortgage lender may retain any security interest in a
> dwelling or real or personal property until the open-end loan is
> terminated***, provided that, if there is no outstanding balance in the
> account and there is no commitment by the licensee to make
> advances, the mortgage lender shall, within ten days ***following
> written demand by the consumer***, deliver to the consumer a release
> of the mortgage, indenture, deed of trust or any other similar
> instrument or document on any dwelling or residential real estate
> taken as security for the open-end loan.

*7 Pa. C.S.A. § 6126 (7)* (emphasis added).   If the case were to go to trial, Wells Fargo would have

the burden of showing that  the Debtor made a written demand for the PNC Agreement to be

terminated and that the PNC Mortgage should thus have been satisfied.   As was noted above, the

---

[11]

Even though the current balance on the PNC Line of Credit is slightly higher than $50,000,
it appears that the excess is attributable to interest, which is not counted toward the maximum.  In
short, there is no indication that the security capacity of the PNC Mortgage has been exceeded.

Parties have stipulated that no written request or instruction to PNC directing the Line of Credit to be terminated has been found.[12]  In other words, under Pennsylvania law Wells Fargo cannot meet its burden of proof on this key issue.   Even giving Wells Fargo the benefit of the doubt by assuming that the Payoff Letter shows that NCB had received some sort of request to terminate the Line of Credit, it does not establish a written request, which is what the statute requires.

Also relevant here is the Pennsylvania Mortgage Satisfaction Act, *21 P.S. §§721-1, et seq*.[13]  In particular, *Section 721-6* provides that a written notice must be sent to the mortgage holder in order to trigger a duty to satisfy the mortgage.  The notice must be sent by certified or registered mail, with a return receipt requested.  Furthermore, the notice must be in a form that is substantially the same as the form as shown in *Section 721-6(c)*.  The first part of that required form

---

[12]

Paragraph 18 of the Stipulation states:

> The parties have not located any written request or written instruction that was sent by Debtor or anyone on behalf of Debtor to National City or PNC which directed the line of credit to be terminated or otherwise frozen, closed, or cancelled.

[13]

The Court notes here that Wells Fargo relies on another statute , *21 P.S. §681,*  in support of its argument that PNC had a duty to satisfy the PNC Mortgage and breached that duty by failing to do so.  *See*, Wells Fargo's Brief in support of its motion for summary judgment, Doc.No. 89 at 9-10.  Wells Fargo also cites *O'Donoghue v. Laurel Savings Association*, 728 A.2d 914 (Pa. 1999) for the proposition that a written request for a mortgage to be satisfied is not necessary under *Section 681*, and that a verbal request will do.  According to Wells Fargo  that  means it does not need to prove that a written request to satisfy the PNC Mortgage was ever sent to NCB.  *Id*.  The problem with this argument is that *Section 681* was repealed and replaced effective February 8, 2003 by the *Mortgage Satisfaction Act* to the extent it is inconsistent with that Act.  *See*, e.g., *Campbell v. Bank of Am., N.A.*, No. 05-CV-972, 2005 WL 3542668, at *2 (E.D. Pa. Dec. 20, 2005).  Both the PNC Mortgage and the WF Mortgage post-date the enactment of the *Mortgage Satisfaction Act* by several years, so there is no question that it, and not *Section 681,* applies in this case.

21

notice, in relevant part, states as follows:

> To the mortgagee named below:
>
> The party issuing this notice believes that the mortgagee of the mortgage described below has received full satisfaction and payment of all amounts secured by the mortgage, including any applicable satisfaction fee, ***and that, where applicable, the mortgagee has been instructed in writing, effective as of the date and time of receipt of the mortgage payoff figure, to close and decline any further advances on any open line of credit which was secured by the affected mortgage.*** The party issuing this notice hereby requests that the mortgagee issue and present for recording a satisfaction piece concerning the mortgage or provide a satisfactory reason why the mortgage should not be satisfied to the party issuing this notice.

*21 P.S. § 721-6 (c)* (emphasis added). This adds a further level of stringency under Pennsylvania law before an open-ended mortgage must be satisfied since both the method of delivery and the contents of the written notice, including a representation that there was a written direction made to close and decline any further advances on the line of credit, are specified by statute. *See also*, e.g., *Kornfeld v. Atl. Fin. Fed.*, 2004 Pa. Super 309, 856 A.2d 170, 174 (2004) (*Section 721–6* substantially changed the mortgage satisfaction law and, *inter alia*, now requires that the mortgagor's request for satisfaction be in writing, in a prescribed form set forth in the statute). Wells Fargo has not shown that the Line of Credit was terminated by written direction, nor has it shown that the statutory directives needed in order to mandate PNC to satisfy the PNC Mortgage were met.

When examined under Pennsylvania law, it is therefore clear that Wells Fargo has not shown that the Line of Credit was ever terminated or properly instructed to be terminated at any time before the Post-Payoff Advances were made to the Debtor. Pennsylvania law requires a written

notice to the lender, from or on behalf of the borrower, and in a specific form and by a specific

method of delivery,  to effect an early termination of an open-end account, even  when the unpaid

balance is zero.   Wells Fargo concedes that the Parties have not located any such  written request

or written instruction that was sent by Debtor or anyone acting on behalf of Debtor to NCB which

directed the Line of Credit to be terminated or otherwise frozen, closed, or canceled.  Wells Fargo

argues that this does not necessarily mean that no such writing exists, only that the parties have been

unable to find one, but that is simply speculation on the part of Wells Fargo and will not do to avoid

summary judgment.

Wells Fargo would have the burden of proof at trial on the issue of termination of

the Line of Credit and to avoid summary judgment on the point it is required to demonstrate  some

evidence of record to show an evidentiary basis for concluding that a  written request to terminate

the Line of Credit was made.  *See,* e.g., *Kovala v. Steele*, No. 1:09-cv-00801, 2011 WL 1828514, at

*3 (M.D. Pa. May 11, 2011) ("Where, as here, the party opposing a motion for summary judgment

bears the ultimate burden of proof on an issue at trial, the moving party discharges its burden by

'pointing out' to the court that there is an absence of evidence supporting the nonmoving party's

claim....The non-moving party then must identify evidence of record that creates a genuine issue of

material fact if it is to survive summary judgment.")(citations omitted). *See also*, *10A Fed. Prac. &*

*Proc. Civ. § 2727.1* (4th ed.)  (where non-moving party has ultimate burden of persuasion at trial,

moving party meets its burden of production either by submitting affirmative evidence negating an

essential element of the nonmovant's claim or by demonstrating that the nonmoving party's evidence

itself is insufficient to establish an essential element of its claim). Here, PNC has pointed out, and

23

indeed Wells Fargo has stipulated, that no written request for a termination of the Line of Credit has been located, an essential element of the Wells Fargo claim. It is therefore incumbent upon Wells Fargo to identify some evidence that there was such a written request and it has failed to do so, making a grant of summary judgment in favor of PNC proper.

The same result obtains under Ohio law, which is quite similar to the law of Pennsylvania on the issues of the priority accorded an open-end mortgage and how an early termination of an open-ended account and satisfaction of the accompanying open-end mortgage must be accomplished. Ohio's open-ended mortgage statute, *Ohio Rev. Code Ann. § 5301.232* , is analogous to *42 Pa. C.S.A. §8143,* and it too provides that a qualifying open -end mortgage may secure unpaid balances of loan advances made after the mortgage is recorded to the extent that the total unpaid loan indebtedness, exclusive of interest, does not exceed the maximum amount of loan indebtedness which the mortgage provides may be outstanding at any time. Again, there is no dispute that the PNC Mortgage is a qualifying open-end mortgage under this statute since it is expressly identified as such and it includes a $50,000 maximum amount of debt. Furthermore, under *Section 5301.232(B)* the PNC Mortgage is a lien from the time it is recorded for the full amount of the total unpaid loan indebtedness, including the unpaid balances of such advances that are made under such mortgage, plus interest, regardless of the time when such advances are made. The PNC Mortgage would thus have priority over the WF Mortgage under Ohio law even as to the Post-Payoff Advances made to the Debtor after the WF Mortgage was recorded unless the Line of Credit account had been properly terminated prior to those advances being made.

With respect to that issue, PNC argues that the account was not properly terminated, relying on another  provision in  the Ohio Revised Code which states:

> (F) Whenever there is no unpaid balance in an open-end loan account, the account may be terminated by written notice, by the borrower or the registrant, to the other party.

*Ohio Rev. Code Ann. § 1321.58 (F)* (in relevant part).  While Ohio law does not appear to have the more detailed form and method of delivery requirements of Pennsylvania law for terminating an open-ended account, it does have the same basic requirement that the notice must be written.  Courts applying *Section 1321.58(F)*  have uniformly found that where there has been no written notice to the open-end mortgage holder, or even where there has been a writing of some sort but it does not include a clear direction to terminate the account,  the open-end loan account is not terminated and the mortgage of the open-end account creditor thus maintains its priority for future advances over a subsequent lender's mortgage that provided the funds used to temporarily pay the open-end account down to zero.

In other words, these courts have found in favor of the open-end mortgage holder in circumstances very similar to what occurred in the present case. *See*, e.g.,  *Household Realty Corp. v. Hoolin*, No. 70411, 1996 WL 476470, at *2 (Ohio Ct. App. Aug. 22, 1996) (phone discussion during which possible termination of open-end account was discussed was not sufficient to terminate the account where borrowers did not request termination in writing and there was no evidence that lender promised to close account without a written request as required by *Section 1321.58(F)*); *Chase Manhattan Bank v. Parker*, No. CA2003-11-299, 2005 WL 880235, at *2 (Ohio Ct. App. Apr. 18,

2005) (letters from escrow agent with payoff check to holders of open-end mortgages did not constitute the written notice required by *Section 1321.58(F)* to terminate the accounts because it did not explicitly request the termination of the accounts and therefore open-end mortgages were never released and maintained their priority over a subsequent mortgage); *Bank of New York v. Fifth Third Bank of Cent. Ohio*, No. 01 CAE 03005, 2002 WL 121925, at *4 (Ohio Ct. App. Jan. 30, 2002) (open-end mortgage on home equity line of credit account retained priority over subsequent mortgage where borrowers never made a written request to terminate the account, and where there was no evidence that escrow agent which had sent a "termination letter" to the open-end mortgage holder was acting as the agent of the borrowers); *JP Morgan Chase Bank, N.A. v. Carbone*, No. 07 MA 147, 2008 WL 927777, at *4 (Ohio Ct. App. Mar. 17, 2008) (prior open-end mortgage retained priority over a subsequent mortgage even though the balance of the loan had been paid down to zero where there was no evidence that written notice of termination had been given as required by *Section 1321.58(F)*, and where terms of the loan agreement gave the borrower a ten year draw period that had not yet expired).

These cases are well-reasoned and Wells Fargo has not cited to any contrary authority. The Court thus finds that they represent the interpretation of *Section 1321.58(F)* that the Ohio Supreme Court would be likely to adopt if faced with the same issue. Based on that conclusion, the fact that no written notice of termination of the Line of Credit has been identified means that the PNC Mortgage must prevail over the WF Mortgage under Ohio law as well.[14]

---

[14] It should be noted that PNC also argues that federal regulations found at *12 C.F.R. §1026.40,* dealing with requirements for home equity plans, also required a written request from the Debtor before the Line of Credit could be terminated. Because the Court has reached the same conclusion

Although Wells Fargo cannot prevail on statutory grounds, that is not the end of the matter because it proposes alternative theories  in its motion for summary judgment for the proposition that the  WF Mortgage  should be found to have priority over the PNC Mortgage even though it was filed later in time.[15]   The first such theory is that NCB somehow promised that it would terminate the PNC Line of Credit and satisfy the PNC Mortgage upon receiving payment of the balance due on that account.  Wells Fargo argues that it can thereby  be granted relief under the rubric of promissory estoppel or equitable estoppel.[16]  The Court disagrees.

A promissory estoppel claim requires the plaintiff to prove (1) the defendant made a promise that it should have reasonably expected to induce action or forbearance on plaintiff's part; (2) the plaintiff actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise.  *Voltarelli v. Immaculata University*, No. 21-1068, 2022 WL 2791747, at *4 (E.D. Pa. July 14, 2022).  The Wells Fargo argument fails as to the very first element, which requires that it show facts demonstrating something beyond simply a "broad and vague implied promise."  *Id.  See also*, *C&K Petroleum Products, Inc. v. Equibank*, 839

---

under both Pennsylvania and Ohio law, it need not consider whether PNC's argument on federal law grounds is correct, and it expresses no opinion on that question.

[15]    As was noted earlier, it is undisputed that under Pennsylvania law priority as between mortgages is generally based on when they are recorded, *i.e.*, a "first in time" principle.  *See*, *42 Pa.C.S.A. §8141(2)* (mortgage priority determined by the time they are "left for record"), *21 P.S. §622* (mortgages shall have priority "according to the date of recording the same").  *See also*, *First Cmlth. Bank v. Heller*, 863 A.2d 1153, 1156 (Pa.Super.Ct. 2004) (recognizing the first in time principle).  Ohio law follows this same principle. *See*, *Ohio Rev. Code Ann. §5301.23.*

[16]    The Third-Party Complaint filed by Wells Fargo says nothing about "estoppel," but since PNC has not objected that the estoppel theory should be disallowed as beyond the scope of the pleadings, the Court will consider it on its merits.

F.2d 188, 192 (3d Cir. 1988) (affirming lower court's dismissal of a promissory estoppel claim based on a broad and vague implied promise because otherwise promissory estoppel would be "rendered meaningless"); *Ankerstjerne v. Schlumberger Ltd.*, No. A.03-3607, 2004 WL 1068806, at *5 (E.D. Pa. May 12, 2004), aff'd. 155 F. App'x. 48 (3d Cir. 2005) (for purposes of promissory estoppel the promise must indicate the intent of the parties with "reasonable certainty"); *Penn-Aire Aviation, Inc. v. Adapt Appalachia, LLC*, No. 565 WDA 2016, 2017 WL 3169280, at *5 (Pa. Super. Ct. July 26, 2017) (promissory statements must objectively evidence a sufficient commitment or assurance on which a reasonable person would rely).

Wells Fargo has not pointed to any express promise that NCB ever made to it. Certainly, the Payoff Letter, which was not even addressed to Wells Fargo, contains none, nor has Wells Fargo identified any other written or oral statement by NCB or PNC to Wells Fargo constituting a promise. To the extent the Payoff Letter could even be construed as an implied promise it would at best be of the broad and vague variety only, and clearly insufficient to sustain a promissory estoppel claim. Going one step further, and even assuming arguendo that the Payoff Letter could somehow be construed as an implied promise that was sufficiently definite to support a promissory estoppel claim, Wells Fargo's claim would still fail because, as will be discussed further below in connection with the claim for equitable subrogation, Wells Fargo could not show that injustice can only be avoided by enforcing the promise and therefore cannot meet the third element needed for a promissory estoppel claim.[17]

---

[17]

Promissory estoppel, like equitable subrogation and unjust enrichment, is an equitable remedy and is thus subject to the same guiding principles and maxims of equity

Wells Fargo's alternative designation of this theory as one of equitable estoppel is likewise unavailing.  While promissory estoppel rests upon a promise to do something in the future, equitable estoppel concerns a statement of present fact.  *Commonwealth, Dep't of Pub. Welfare v. Sch. Dist. of Phila.*, 49 Pa. Commw. 316, 410 A.2d 1311, 1314 (Pa.Commw.Ct.1980) (citing *Langer v. Superior Steel Corp.*, 105 Pa.Super. 579, 161 A. 571 (1932)). Wells Fargo has not identified any statement of present fact which NCB allegedly made to it, whether in the Payoff Letter or otherwise. Even more importantly, equitable estoppel can function only as a defense, not as a cause of action in itself.  *Peluso v. Kistner*, 970 A.2d 530, 533 (Pa. Commw. Ct. 2009).

The next theory proposed by Wells Fargo is one seeking the imposition of an equitable lien in favor of Wells Fargo with priority over the PNC Mortgage under the doctrine of equitable subrogation.  Since this is a request for the Court to exercise its equitable powers it must be considered within the context of the maxims and principles of equity that guide courts, one of which is that equity follows the law.  This has been explained as follows:

> Even recognizing that a court of equity has broad powers, '(i)t is a mistake to suppose, that a court of equity is amenable to no law, either common or statute, and assumes the rule of an arbitrary legislator in every particular case.' Blackstone's Commentaries on the Law 732 (B. Gavit ed. 1941). When the rights of a party are clearly established by defined principles of law, equity should not change or unsettle those rights. Equity follows the law.

*First Fed. Sav. & Loan Ass'n of Lancaster v. Swift*, 457 Pa. 206, 210, 321 A.2d 895, 897 (1974). *See also*, e.g., *Bauer v. P. A. Cutri Co. of Bradford*, 434 Pa. 305, 310, 253 A.2d 252, 255 (1969) (equitable considerations will not be used to deprive a party of its rights at law); *In re Roth*, 301 B.R.

451, 455 (Bankr. W.D. Pa. 2003), aff'd, 2004 WL 716743 (W.D. Pa. Apr. 1, 2004) (unless a party follows the demand of an applicable statute it will not be aided by a plea in equity).

The Court finds that a resort to equity to subrogate the PNC Mortgage to an equitable lien in favor of Wells Fargo in this case would contravene this clear principle by depriving PNC of its rights as an open-ended mortgagee under applicable statutory law dealing with open-ended mortgages. By way of background, for a long time the subject of future advances made under an open-ended mortgage and whether the mortgagee would be entitled to priority for such advances over intervening lienors created a vexing problem. The common law developed a rule to deny priority with respect to future advances that the open-ended mortgagee was not contractually obligated to make (so-called "optional" advances), as against intervening liens of which the mortgagee had notice when the advance was made. This was not found to be a satisfactory state of affairs because it often required the resolution of difficult issues over whether an advance had been optional or not and what sort of notice the open-ended mortgagee had when the advance was made before lien priority could be determined. Borrowers were also hampered from obtaining refinancing because of the uncertainty engendered by the common law rule. *See*, generally, Restatement (Third) of Property (Mortgages) §§ 2.1 -2.3 (1997), including Comments and Reporter's Notes, for a discussion.

As a result, a number of states, including both Pennsylvania and Ohio, enacted statutes to address lien priority in the case of future advances made under open-ended mortgages. *See*, R. Wilson Freyermuth & Dale A. Whitman, *Residential Mortgage Default and the Constraints of Junior Liens*, 57 U. Louisville L. Rev. 207, 215-19 (2019). The relevant Pennsylvania statute,

30

previously discussed above, is found at *42 Pa. C.S.A. §8143* and it provides in relevant part as

follows:

> (a) ***General rule***.– Whether or not it secures any other debt or
> obligation, an open-end mortgage... may secure unpaid balances of
> advances made after such open-end mortgage is left for record. The
> validity and enforceability of the lien of an open-end mortgage shall
> not be affected by the fact that the first advance is made after the date
> of recording of the mortgage or that there may be no outstanding
> indebtedness for a period of time after an advance or advances may
> have been made and repaid.
>
> ...
>
> (c) ***Mortgagor may limit indebtedness***.– The mortgagor may limit
> the indebtedness secured by an open-end mortgage, and release the
> obligation of the mortgagee to make any further payments, to that in
> existence at the time of the delivery of a written notice to that effect
> to the recorder for record, if the notice is executed by the mortgagor,
> is acknowledged according to law and states the volume and initial
> page of the record or the recorder's file number of the mortgage, and
> a copy thereof is served upon the holder of the mortgage more than
> three days prior to the delivery of the notice to the recorder for
> record...
>
> (d) ***Notice***.– The written notices provided for in subsections (b) and
> (c) shall be deemed to have been received by or served upon the
> holder of the mortgage when delivered to the holder personally or by
> registered or certified mail at the address of the holder appearing in
> the mortgage or an assignment thereof ...
>
> ...

*42 Pa.C.S.A § 8143(a),(c),(d). Section 8143(c)* thus provides for a so-called "cut-off notice" and

enables the mortgagor to terminate the right to receive any future advances from the open-ended

mortgagee, thereby enabling a subsequent intervening mortgagee to be assured of maintaining its

priority even if any future advances are made by the open-ended mortgagee. The Ohio open-ended

31

mortgage statute similarly provides for a cut-off notice in these circumstances.   As summed up in one article on the subject, under a statute like those in Pennsylvania and Ohio, "so long as the [open-ended] lender has not received a cut-off notice, it can be confident that all of the advances it makes will carry the original mortgage's priority." Grant S. Nelson & Dale A. Whitman, *Adopting Restatement Mortgage Subrogation Principles: Saving Billions of Dollars for Refinancing Homeowners*, 2006 B.Y.U. L. Rev. 305, 334 (2006).

There is no evidence that any cut-off notice was sent to NCB by the Debtor in this case.  Were the Court to disregard the statutory requirements and equitably subrogate the PNC Mortgage it  would be depriving PNC of the priority granted to it by the statute and violating the principle that equity follows the law.   The Court notes that neither *Section 8143*, nor the corresponding Ohio statute, *Ohio Rev. Code Ann. § 5301.232(C),* is all that new, with the former having been enacted in 1990 and the latter in 1987, both many years before the relevant events in this case.  Wells Fargo as a large and sophisticated lender should have been aware of the statutes and could easily have required the Debtor to prove that she had served a cut-off notice on NCB as a condition of making the WF Loan.[18] The Court therefore finds that Wells Fargo is not entitled to

---

[18]
For this and other reasons, the Court rejects the argument made by counsel for Wells Fargo to the effect that Wells Fargo had no ability to protect itself and had to rely on the Debtor's promise and the PNC Payoff Letter because it could not be assured that the PNC Mortgage would be satisfied following the closing on the WF Loan.  To the contrary, Wells Fargo could have been assured that there would be no further advances made on the Line of Credit, thus putting Wells Fargo in a first priority position, by simply requiring the Debtor to prove in advance of the closing that a proper written termination notice or cut-off notice had been sent to PNC.  Also, as PNC pointed out at the argument, Wells Fargo had the ability to monitor public records following the closing and so could have known that no satisfaction of the PNC Mortgage was ever filed, and it could have even tried to compel satisfaction in certain circumstances.  *See*, 21 P.S. §721-7 ("settlement officer" satisfaction).

equitable subrogation under the undisputed facts of this case.

A final theory put forward by Wells Fargo is that PNC would somehow be unjustly enriched if the PNC Mortgage is recognized to have priority over the WF Mortgage. This must be denied for the same reason as the claim for equitable subrogation. Unjust enrichment is a doctrine based in equity and so is subject to the same principle that equity follows the law as was discussed above. *See*, e.g., *In re Forman Enterprises, Inc.*, 281 B.R. 600, 608 (Bankr. W.D. Pa. 2002) (citing *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa.Super.Ct. 1999), appeal denied, 751 A.2d 192 (Pa. 2000)). Furthermore, in deciding whether unjust enrichment should be imposed the most important factor to be considered in applying the doctrine is whether the enrichment of the defendant is unjust. *Schenck v. K.E. David, Ltd.*, 446 Pa. Super. 94, 98, 666 A.2d 327, 328 (1995). Even if the Court were to conclude that PNC was enriched by receiving the payment from the WF Loan, but yet still retaining its first place priority position with respect to the Post-Payoff Advances, it is difficult to see how that could be considered "unjust" since that is just the result required by the relevant statutes in the absence of a termination of the PNC Agreement or the service of a cut-off notice by the Debtor, neither of which happened here.[19]

To sum up, the undisputed material facts in the case lead the Court to the conclusion that the PNC Mortgage has priority over the WF Mortgage with respect to the Post-Payoff

---

[19] The Court also notes that the Commitment Letter required that prior to the closing on the WF Loan, Wells Fargo was to be provided with evidence of a title insurance policy binder that would "insure the validity and priority of the Lender's first lien on the property." Assuming such insurance coverage is in place, Wells Fargo may be protected by it which would furnish another reason to conclude that it is not unjust for the PNC Mortgage to maintain its priority.

Advances.  Wells Fargo had it easily within its power to avoid what happened here by taking the

statutorily-required steps to preserve the priority of the WF Mortgage as against any future advances

made by PNC under the Line of Credit, but it failed to do so.  Most importantly, Wells Fargo would

have the burden at trial to show that a written notice to terminate the Line of Credit, or to cut off the

Debtor's right to any future advances under the Line of Credit, was delivered to PNC, and it has

failed to point to any evidence for such a notice.  Accordingly, PNC's motion for summary judgment

will be granted and Wells Fargo's motion for summary judgment will be denied.

        An appropriate Order will be entered separately.


        /s/ Carlota M. Böhm

Dated: January 5, 2023        Carlota M. Böhm, Judge
        United States Bankruptcy Court


Case administrator to serve:
    Daniel R. White, Esq.
    Bradley A. King, Esq.        FILED
    Michael P. Oliverio, Esq.      1/5/23 12:58 pm
    Debtor        CLERK
        U.S. BANKRUPTCY
        COURT - WDPA